[No. 22722. Department One. February 2, 1931.]

ANNA ROSENKRANZ, *Respondent,* v. GUARANTY TRUST COMPANY *et al., Appellants.*[1]

*Cheney & Hutcheson,* for appellants.
*McAulay & Freece,* for respondent.
*Preston, Thorgrimson & Turner, amicus curiae.*

HOLCOMB, J.—The amended complaint in this action alleges a cause of action in replevin, or for the redelivery of certain Grandview Irrigation District, Snipes Mountain Irrigation District and Yakima County Sub. 9 of Dist. No. 3 Drainage Improvement District bonds numbers 6, 7, 8, 9 and 10. The answer of appellants to the amended complaint consists of denials of the allegations of the amended complaint, and an affirmative defense and cross-complaint, setting forth copies of the bonds sought to be recovered and an allegation that all the bonds are negotiable bonds, purchased in good faith, and that appellant, the Washington National Investment Company, was the owner

[1]Reported in 295 Pac. 487.

thereof, and prayed that the court quiet its title to the bonds. The reply admits that the copies of the bonds attached to the answer and cross-complaint were true and correct copies, and denies the rest of the cross-complaint.

Non-suit was granted as to the irrigation district bonds, upon the ground that they were negotiable instruments. At the close of the entire case, both respondent and appellant moved for a directed verdict, upon which the court withdrew the case from the jury and directed a verdict for respondent for the return of the bonds, or, in lieu thereof, the sum of $1,030 damages. This appeal resulted.

Owing to the action of the trial court, we are not further concerned with the irrigation district bonds.

These are the substantial facts:

About ten years before the transaction in question, O. W. Rosenkranz, husband of respondent, died, leaving a rather large estate, of which respondent became the owner under a trust. She appointed her son her agent, who looked after all of her affairs. During about the same time, one Ross was in business in Yakima, engaged in dealing in securities. He had a good reputation, and was considered thoroughly reliable. For about six years, respondent, through her son, bought, sold and exchanged securities with Ross. During about five months between February 13, 1929, and July 6, 1929, his dealings were:

| | |
|---|---|
| February 13 .............. | $2,040 |
| April 26 .................. | 4,000 |
| April 26 .................. | 500 |
| May 3 ..................... | 4,000 |
| July 6 .................... | 3,500 |
| July 20 ................... | 105 |
| Total.................. | $14,145 |

Other business than that above shown had been done with Ross in the other five and one-half years. All of the transactions seem to have been had in the same manner as that here in question.

The transaction, out of which this action grew, occurred as follows:

In the early part of July, Ross stopped the son of respondent, who transacted her business, on the street, and asked him if he wished to exchange one thousand dollars worth of drainage bonds, fifteen hundred dollars worth of Snipes Mountain bonds and one thousand dollars worth of Grandview Irrigation bonds belonging to respondent, for seven per cent warrants of Yakima issued on the West Chestnut street paving improvement, which would be cash in the fall. The son talked it over with respondent, who told him to go ahead if he thought fit. On July 6, the son took the bonds, above recited, out of a safety deposit box, went to Ross, and said he was ready to trade, and told Ross to get his warrants. Ross told him that he could not get the warrants from the First National Bank, unless he took the bonds. The son told him that was all right, gave Ross the bonds, and took receipts for them.

The receipts for the Grandview and Snipes Mountain Irrigation bonds are in the same form as the one below, but are not now material. The receipt for the drainage district bonds reads as follows:

"No.                                          July 6, 1929

"Received from O. H. Rosenkranz in good order the following articles: Bonds Nos. 6-7-8-9-10, Yakima County Drainage Sub 9 of Dist. No. 3. For exchange. Addressed to........................                Richard Ross."

All of the bonds were payable to bearer.

The First National Bank was distant about three-fourths of a block from where Rosenkranz and Ross met. Ross told Rosenkranz to come back in an hour. At

about that time, Rosenkranz came back, but Ross was not there. Two hours later, he returned, and Ross told him the warrants had to be signed by the city treasurer, and told the son to come in the next morning. The next morning, Ross told him the warrants had to be signed by a man in Tacoma. Something like this occurred nearly every day for about three weeks. Meantime, on July 20, respondent delivered $105 in coupons to Ross, to be collected for her. She then told Ross that she wanted the warrants or the bonds. The son then went to his attorney, without result. They then found that appellants had the bonds. Demand was made upon them, which was refused.

These bonds came into the possession of the Investment Company as follows:

About 11:30 a. m. on July 6, Ross, who had been buying a considerable number of bonds from the company, came to Bradshaw, its manager, showed him the Snipes Mountain and the Drainage bonds, placed a value of $2,500 upon them and told Bradshaw that he wished to exchange them for $1,500 worth of Soap Lake bonds and some cash. At that time, a dispute existed between Ross and the Investment Company, as to whether or not Ross owed it $2,500. After some discussion between Bradshaw and Ross, the Investment Company decided to make the deal to take $2,500 worth of the Snipes Mountain and Drainage bonds, and give in exchange therefor $1,500, at par value, of Soap Lake Water Revenue bonds, $650 in cash, and to credit Ross with $350 upon the disputed account. On a previous deal, Ross had left with the Investment Company a $100 bond, as collateral security for a loan which had been paid off, and which Bradshaw allowed to go also as a credit against Ross' account, making the total credit to Ross on the transaction of $450. The Snipes Mountain and the Drainage bonds were

delivered to the Investment Company, the Soap Lake bonds and the cash to Ross, and the transaction was closed.

The Guaranty Trust Company is the active manager of the Washington National Investment Company, and Bradshaw is manager of both companies. There is no evidence that Bradshaw, or any other officer of the Trust Company or of the Investment Company, had any knowledge, or anything to put them upon inquiry, as to who was the actual owner of any of the bonds. The deal made with Ross was such as had occurred many times between them.

The bonds in question, in so far as material to this inquiry, read:

"KNOW ALL MEN BY THESE PRESENTS: That the County of Yakima, State of Washington, for value received, hereby promises to pay to bearer the sum of $200.00, lawful money of the United States of America, on or before the 1st day of January, 1940, with interest thereon at six per cent. per annum, payable July 1, 1928, and semi-annually thereafter on the first days of January and July of each year on presentation and surrender of the interest coupons hereto attached as they severally become due."

On their faces, they specifically state that they are to be paid by assessments "upon the property in Sub-district 9 of Drainage Improvement District No. 3 of Yakima County, and are not a general obligation of said county." They are specifically made payable out of a special fund, designated as "the bond redemption fund of Sub-district 9 of Drainage Improvement District No. 3."

Appellants contend that the bonds are negotiable bonds, being payable to bearer, transferable merely by delivery from hand to hand. They also contend that, regardless of negotiability, respondent is estopped to claim title to them on the facts herein shown.

The question of negotiability of such instruments as those before us, payable simply to bearer, may be disregarded, because we conclude that the situation in this case calls for the application of the principle of comparative innocence as to one or the other of these parties.

The ultimate question is, in brief, upon whom must this loss fall?

The delivery and the form of the receipt given to the son of respondent, establish the intent that Ross should take and exchange the bonds for the warrants, thus vesting full apparent title to the bonds in the person who parted with the warrants. Hence, Ross became, in effect, the agent of the owner of the bonds, for the purpose of effecting the exchange. The owner of the bonds thereby became the undisclosed principal of Ross, and vested in Ross, the bearer, ostensible evidence of title, in order that he might effect the exchange. Respondent and her agent thus placed it within the power of Ross to transfer title to the bonds in suit to anyone dealing with him.

Respondent asserts that there is no agency existing in this case. We are of the contrary mind. We have held that, where a surety company delivers a bond to a contractor for the purpose of closing a building contract, the contractor is made the agent of the surety for the purpose of delivering the bond, and the surety cannot claim that the bond was not given upon the contract for which it was delivered, if there was nothing on the face of the bond which would tend to put the owner upon inquiry. *Gritman v. United States Fidelity & Guaranty Co.*, 41 Wash. 77, 83 Pac. 6. See, also, *King County v. Ferry,* 5 Wash. 536, 32 Pac. 538, 34 Am. St. 880, 19 L. R. A. 500.

Manifestly, if the principle of agency applies in a

case of delivery of a surety bond to the obligee therein by the contractor, it applies in such a case as this.

These bonds were not obtained by larceny, robbery or burglary, by reason of which no sale, whether in good faith on the part of the purchaser or not, should divest the owner of the right or title to the property, under Rem. Comp. Stat., § 2129, as urged by respondent. Nor is our decision in *Linn v. Reid,* 114 Wash. 609, 196 Pac. 13, a case in support of respondent, as urged by her. On the contrary, the case at bar is more like that of *Harris v. Northwest Motor Co.,* 116 Wash. 412, 199 Pac. 992, which was distinguished from the *Linn* case, *supra,* on the facts and the law of each case, and where we said that the taker of the property in that case "embezzled the money which he received from the sale of the car and not the car itself." So here: What Ross embezzled were the proceeds of the bonds, and not the bonds themselves.

In a decision written by Judge Holmes while Chief Justice of the supreme court of Massachusetts, involving the conversion of two certificates of indebtedness of the city of Boston, payable to one Scollans, transferable only in the office of the City Treasurer, on the back of which was an assignment in blank executed and acknowledged by Scollans, which, of course, is not identical with the case at bar, in *Scollans v. Rollins,* 179 Mass. 346, 60 N. E. 983, Judge Holmes said:

"But if the owner of the instrument entrusts it to another, he does so charged with notice of the power to deceive which he is putting into that other's hands, and if deception follows he must bear the burden. . . . In this case, as in some others, it cannot be said that the owner is free from all obligation to contemplate the possibility of wrong-doing by a third person."

The same principle was followed in *Russell v. American Bell Telephone Co.*, 180 Mass. 467, 62 N. E. 751, involving a stock certificate signed in blank, delivered to an agent for the purpose of surrendering it to the company in order to obtain a new certificate, and the agent wrongfully obtained an advance on the strength of the certificate, by putting it in pledge. Justice Holmes there, again, delivered the opinion of the court and, among other things, said:

"The qualification of the rule, as not applying when the instrument is stolen, is not based upon the name of the agent's crime but upon the fact that in the ordinary and typical case of theft the owner has not intrusted the agent with the document and therefore is not considered to have done enough to be estopped as against a purchaser in good faith. He certainly has not done enough if the estoppel is based upon the principle that when one of two innocent persons is to suffer the sufferer should be the one whose confidence put into the hands of the wrongdoer the means of doing the wrong. But in a case like the present the agent has been intrusted with the converted property, and it is totally immaterial whether, by a stretch which extends larceny beyond the true field of trespass, his wrong has been brought within the criminal law or not. The ground of the estoppel is present and the estoppel arises.

"The distinction is not new. . . . It cannot matter in the latter class that the agent intended the fraud from the outset."

The above case was quoted with approval, and the same principle applied, in *National Safe Deposit, Sav. & Trust Co. v. Hibbs*, 229 U. S. 391. In the last cited case, certain stock certificates belonging to a bank, endorsed and authenticated with evidence of title, were intrusted by the bank to its trusted agent, who, in gross breach of his duty, sold them to a broker, who, in ordinary course of the business and in good faith, sold

them to third parties for full value, and paid over the proceeds to the agent of the bank. The court applied the principle that, where one of two innocent persons must suffer by the acts of the third, he who has enabled such third person to occasion the loss must sustain it.

To the same effect is *Island Trading Co. v. Berg Bros.*, 239 N. Y. 229, 146 N. E. 345.

We have applied the same principle of comparative innocence in numerous cases, although none of them are upon precisely similar facts as in the case at bar. Some analogous cases in which we have applied that rule, are: *Willett v. Central Yakima Ranches Co.*, 126 Wash. 587, 219 Pac. 20, and cases therein cited; *Flynn v. Garford Motor Truck Co.*, 149 Wash. 264, 270 Pac. 806.

In the present case, appellants were utterly innocent of any wrongful knowledge or intent. Respondent put it in the power of her agent to accomplish the fraud.

We therefore conclude that, appellants being entirely innocent, and respondent not being so, the loss should fall on respondent. The judgment is therefore reversed, with instructions to grant judgment in favor of appellants quieting their title to the bonds.

TOLMAN, C. J., PARKER, MAIN, and MITCHELL, JJ., concur.